# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARBLELIFE, INC., | : |
| Plaintiff, | : |
| | : |
| v. | : CIVIL ACTION |
| | : |
| | : NO. 10-2480 |
| STONE RESOURCES, INC., | : |
| Defendant. | : |

## MEMORANDUM

**Tucker, J.**                                                                                                                  **December\_\_\_, 2010**

Presently before the Court is Plaintiff's Motion For Preliminary Injunction (Doc.6) and Defendant's Response in Opposition thereto (Doc. 24). For the reasons set forth below and upon consideration of the parties' submissions and oral argument held before this Court on December 7- 10, 2010, this Court will grant Plaintiff's Motion For Preliminary Injunction.

**I.**                               **FACTUAL BACKGROUND**

The instant action arises out of allegations of breach of contract, trademark infringement, false designation of origin, and dilution of trademark brought by Plaintiff MarbleLife, Inc. ("MarbleLife") against Defendant Stone Resources, Inc. ("Stone Resources"). Plaintiff requests that this Court enter an order enjoining Defendant from violating its contractual, statutory, and/or common law obligations pending resolution of a separate arbitration proceeding in Dallas, Texas. Plaintiff also requests reasonable attorneys fees, expenses and costs and other and further relief

as the Court may deem just and equitable.

Plaintiff MarbleLife, a Texas corporation with its principal place of business in Sanford, Florida, is engaged in the business of restoring and repairing granite and other types of inorganic and organic surfaces . (Compl. ¶ 1.) Defendant Stone Resources is a Pennsylvania corporation with its principal place of business in Media, Pennsylvania. (Compl. ¶ 2.) For nearly twenty (20) years, MarbleLife has developed a unique business system for repairing and caring for marble, granite and other surfaces. (Compl. ¶¶ 5-6.) This business system also includes proprietary techniques for marketing, advertising, operating and training. MarbleLife sells franchises of its unique business system under which it grants to franchisees across the United States the rights to use its methods, trademarks, and related services and products. (Compl. ¶ 9.)

On or around April 3, 2000, Plaintiff (as franchiser) and Defendant (as franchisee) entered into a Franchise Agreement ("the Agreement"). (Compl. ¶ 10.) Under the Agreement, Plaintiff granted Defendant the right and license to operate a franchise in a specified territory ("the Territory"). (Compl. ¶ 11.) In addition, Defendant was granted the right and license to use MarbleLife's registered trademark.[1] (Compl. ¶ 12.) Pursuant to the Agreement, Defendant adopted the trade name, "MarbleLife of Delaware Valley." (Compl. ¶ 13.) The Agreement also granted Defendant the right and license to use MarbleLife's unique business system (including a system manual, employee training, and an advertising platform). (Compl. ¶ 14.) The Agreement had an initial term of ten (10) years (which was not extended), and imposed certain requirements upon Defendant following its expiration, including the following: (1) an agreement not to

---

[1] Plaintiff's trademark, MarbleLife ®, is registered with the United States Patent and Trademark Office, U.S. Reg. No. 1589342

compete during the term of the Agreement and for a period of two years following expiration; (2) a requirement to cease using the trademark and/or any System Rights; and (3) a limitation on the use of Plaintiff's "confidential information" only for "the purposes of fulfilling Franchisee's obligations under this Agreement." (Compl. ¶¶ 16-20.)

In the event of termination, the Agreement also included additional consequences of expiration, including the following: (1) the immediate termination of all rights granted to Defendant; (2) the transfer of business, customers, facilities, services, employees, and telephone numbers to Plaintiff; and (3) the return or disposal of certain specified information (i.e., all advertising and promotional materials containing the MarbleLife trademark; all information relating to MarbleLife; all manuals and supplements; and all sales or marketing data relating to MarbleLife). (Compl. ¶ 21.)

In addition, Defendant agreed to indemnify Plaintiff against all costs, expenses, liabilities, and losses related to any violation of the Agreement. (Compl. ¶ 22.) Defendant further agreed that any violation of the noncompete provision and the confidentiality provisions would cause MarbleLife to "suffer irreparable harm" and that MarbleLife could seek "damages or injunctive relief against Franchisee in a court of competent jurisdiction" to address said harm (Compl. ¶ 23.) The Agreement further provides that if MarbleLife prevails in any such litigation, "Franchisee shall reimburse MarbleLife for all costs, attorneys' fees and other expenses incurred by MarbleLife in connection therewith." (Compl. ¶¶ 23-24.) Further, in the event that injunctive relief is unavailable, the Agreement permits Plaintiff to seek "as liquidated damages a sum of money equal to the largest weekly fee paid by Franchisee to MarbleLife during the term of this Agreement times 104." (Compl. ¶ 25.) The parties also agreed that any dispute arising under the

Agreement would be subject to arbitration, except for "any temporary, interim or provisional equitable remedies" the parties may seek. (Compl. ¶ 26.) Finally, the parties agreed that the Agreement would be governed by Texas law. (Compl. ¶ 27.)

The Agreement was set to expire on or around April 3, 2010, absent Defendant's exercise of a right of renewal. (Compl. ¶ 30.) Defendant failed to renew its franchise despite several attempts by Plaintiff to encourage Defendant to do so. (Compl. ¶¶ 31-39.) Accordingly, the Agreement expired, and as a result, Plaintiff ceased receiving royalty payments. (Compl. ¶¶ 40-42.)

According to Plaintiff, Defendant has violated its post-termination obligations and has, instead, become a direct competitor of MarbleLife. (Compl. ¶¶ 43-44.) In fact, Plaintiff alleges that Defendant allowed the Agreement to expire for the express purpose of competing with Plaintiff. (Compl. ¶ 46.) In response to Defendants actions, on April 14, 2010, Plaintiff sent Defendant a notice confirming the expiration of the Agreement and reminding Defendant of its post termination obligations. Said notice also instructed Defendant to cease all use of the MarbleLife trademark and/or System by no later than April 19, 2010. (Compl. ¶ 47.) In contravention of Section 2.5 of the Agreement, Defendant ignored Plaintiff's notice and continued to use both Plaintiff's mark and System. (Compl. ¶ 48.) Specifically, Defendant continued to conduct business under the name, "MarbleLife of Delaware Valley," and as late as May 13, 2010, continued to offer products containing Plaintiff's mark. (Compl. ¶ 50.) Also, Defendant has continued operating in the Territory, offering the same services as Plaintiff in direct competition with Plaintiff. (Compl. ¶ 53.) In addition, Defendant continues to benefit from Plaintiff's exclusive advertising arrangement. (Compl. ¶ 55.)

On April 30, 2010, Defendant admitted to its continued use of the MarbleLife mark and said it would "commence the de-identification process immediately," however, Defendant has failed to confirm that it has stopped using the mark. (Compl. ¶ 74.) Since April 30, 2010, an advertisement for Stone Resources has appeared in an online version of Distinctive Living, featuring the MarbleLife name and mark, as well as a phone number that Defendant used while a MarbleLife franchisee. (Compl. ¶ 74.) Irrespective of Defendant's use of the mark, Plaintiff believes that Defendant is continuing its business in direct competition with MarbleLife in the Territory, using the MarbleLife business system and other proprietary information. (Compl. ¶ 76.)

Accordingly, Plaintiff seeks immediate, emergency relief to enjoin Defendant from its continuing violations. Plaintiff contends that emergency injunctive relief is critical for the following reasons: (1) such relief is currently unavailable in the pending arbitration proceeding; (2) such relief is necessary to protect Plaintiff's interests in the Territory from unfair competition by its former franchisee; (3) Plaintiff's efforts to secure a replacement franchisee for the Territory have been hindered by Defendant's delay in committing to whether it would renew the franchise and Defendant's unauthorized use of the mark in the Territory; (4) Defendant's unauthorized use of the mark has caused confusion among retailers; and (5) Plaintiff's efforts in establishing a new franchisee in the Territory likely will be futile if customers know that a former MarbleLife franchisee is still operating within the Territory.

Based on the foregoing allegations, Plaintiff asserts the following six counts: breach of the Franchise Agreement (Count I); federal trademark infringement (Count II); federal false designation of origin (Count III); federal dilution of trademark (Count IV); Texas and/or

Pennsylvania common law trademark infringement (Count V); and request for preliminary injunction (Count VI).

## II.  PROCEDURAL BACKGROUND

On April 9, 2010 Defendant initiated an arbitration proceeding in Dallas, Texas. Ironically, Defendant made its demand for arbitration identifying itself as "MarbleLife of Delaware Valley." (Compl. ¶ 79.) Plaintiff filed the instant action on May 21, 2010. That same day Plaintiff filed a Motion for Preliminary Injunction. The Court held a hearing on the application for preliminary injunction on December 7, 2010. Said hearing concluded on December 10, 2010.

## II.  LEGAL STANDARD

"[T]he grant of injunctive relief is an 'extraordinary remedy which should be granted only in limited circumstances.'" AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1426-27 (3d Cir. 1994); see also Instant Air Freight Co. v. C. F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989) (citing Frank's GMC Truck Ctr, Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988). Generally, in determining whether to grant a preliminary injunction or a temporary restraining order, courts in this Circuit review four factors: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. Shire US, Inc. v. Barr Labs. Inc., 329 F.3d 348, 352 (3d Cir. 2003) (citations omitted). "[W]hile the burden rests upon the moving party to make [the first] two requisite showings, the district court

'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.'" Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (citation omitted); see also Adams v. Freedom Forge Corp., 204 F.3d 475, 484 (3d Cir. Pa. 2000) (noting that "[i]f relevant, the court should also examine the likelihood of irreparable harm to the nonmoving party and whether the injunction serves the public interest.") All four factors should favor relief before an injunction will be issued. S & R Corp. v. Jiffy Lube Int'l. Inc., 968 F.2d 371, 374, (3d Cir. 1992)(citing Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 192 (3d Cir. 1990)). When a movant seeks a preliminary injunction that is directed at not merely preserving the status quo but at providing mandatory relief, the burden on the moving party is "particularly heavy." Punnett v. Carter, 621 F.2d 578, 582 (3d Cir. 1980)."

In order to prove irreparable harm, the moving party "must 'demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" Acierno, 40 F.3d at 653 (quoting Instant Air Freight Co., 882 F.2d at 801). The word "irreparable connotes that which cannot be repaired, retrieved, put down again, atoned for." Id. (citations omitted). In addition, the claimed injury cannot merely be possible, speculative or remote. [M]ore than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury…'" Id. at 655 (citations omitted).

**III.** **DISCUSSION**

Courts will issue a preliminary injunction only where the following four factors weigh in favor of this extraordinary measure: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the plaintiffs are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.  However, before reaching factors three and four, the moving party must first satisfy its burden with respect to factors one and two. Adams, 204 F.3d at 484.  If a plaintiff fails to satisfy this burden, this is the end of the inquiry, and a preliminary injunction will not be issued.

**A.**     **Likelihood of Success on the Merits**

The first factor of the preliminary injunction analysis is the likelihood of success on the merits.  Here, Plaintiff present three claims: (1) breach of contract; ( 2) trademark violation; and (3) trademark dilution.  As set forth below, it is clear that Plaintiff has satisfied its burden of demonstrating a likelihood of success on the merits with regard to all three claims.

i. Violation of Non-compete Provision

Plaintiff argues that MarbleLife is likely to succeed on the merits of its first claim because Defendant has breached its contractual, statutory, and common law duties by competing with Plaintiff and using Plaintiff's registered trademark after expiration of the Franchise Agreement. Pursuant to Section 9.9 of the Agreement, Texas Law governs the construction of the Agreement. Accordingly, the covenant not to compete at issue is subject to the requirements set out in TEX. BUS. & COM. CODE § 15.50(a).  Section 15.50 (a) provides that

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM. CODE § 15.50

"An agreement is ancillary to an otherwise enforceable agreement if 'it is part of and subsidiary to an otherwise valid transaction or relationship which gives rise to an interest worthy of protection….'" Meineke Discount Muffler v. Jaynes, 999 F.2d 120, 123 (5th Cir. Tex. 1993) (citing DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 682 (Tex.1990)). Texas courts have found the interests worthy of protection to include *inter alia* goodwill, trade secrets, and proprietary information. Peat Marwick Main & Co. v. Haass, 818 S.W.2d 381, 386 (Tex. 1991); see also DeSantis, 793 S.W.2d at 682 (Tex.1990). This Court finds that the covenant not to compete complies with § 15.50(a) because it was ancillary to or part of an otherwise enforceable agreement at the time the agreement was made. Both parties exchanged mutual promises, tendered valuable consideration and operated under the Agreement for ten(10) years. MarbleLife possesses interests worthy of protection, such as, the good will associated with its name and mark and its proprietary and confidential information. Plaintiff has amply demonstrated that its trademark has developed goodwill and it is entitled to protect that goodwill by preventing a former franchisee who operated under its trademark for ten (10)years from competing against it.

Defendant argues that the Agreement is not an enforceable agreement under Tex. Bus. & Com. Code § 15.50 because Plaintiff fraudulently misrepresented its ownership of certain patents. Specifically, Defendant argues that Plaintiff averred that it owned the patent to

9

Interlock, a surface coating originally designed to be applied to polished marble. In support of this argument, Defendant points to Section 8.1 of the Agreement which states in relevant part "*MarbleLife's Representation*. MarbleLife represents and warrants that MarbleLife owns or has the right to use the Mark and System rights in the U.S. and that these do not infringe the rights of third parties." According to Defendant, the Interlock patent reverted to the creator, Bruce R. Maier, once Plaintiff ceased making royalty payments in 1995. Additionally, Defendant argues that Plaintiff breached the Agreement rendering it unenforceable by improperly using the Advertising Fund.

> Section 2.4(d)(iii) of the Agreement provides:

> MarbleLife shall use the advertising fee paid by Franchisee (as described in Section 3.2(b) below) to produce advertising materials and supporting material for products and services offered by the MarbleLife franchisees under the System. MarbleLife may also use this fee to carry out sales, marketing and advertising initiatives for the benefit of all franchisees and company and affiliate operations under the Mark in the U.S. or in a region of the U.S.; provided, however, that MarbleLife will not be obligated to carry out any such initiatives except to the extent that funds are available from advertising fees paid by franchisees in excess of the cost of advertising materials and supporting materials.

According to Defendant, Plaintiff improperly allocated the advertising funds to cover operating expenses, salary costs and management fees. During the hearing, Plaintiff produced testimony substantiating that Alan Mayr, MarbleLife's Chief Operating Officer performed advertising functions as part of his job responsibilities and accordingly a portion of his salary was paid out of the Advertising Fund. On cross- examination John Frietag, witness for Defendant, conceded that despite Defendant's objections to certain allocations he could not dispute one allocation made by Mr. Mayr. In rebutting Defendant's argument regarding the enforceability of the Agreement,

Plaintiff highlighted that the Agreement provided that in the event Defendant believes there to be a material breach of the contract, Defendant was required to memorialize its objections in writing and provide Plaintiff with an opportunity to cure said breach. Defendant never voiced any objection to the use of the advertising fund prior to the instant action. Moreover, Defendant operated under the Agreement for ten (10) years and there was not a single instance where Stone Resources was unable to purchase Interlock or apply it in any manner it chose.

Accordingly, this Court rejects Defendants argument that the Agreement is not enforceable under Texas law. Defendant has not substantiated that Joe Smith, Chief Executive Officer of Stone Resources, was induced into entering into the Agreement because of alleged misrepresentations made by Plaintiff concerning ownership of the Interlock patent. Furthermore, Defendant has failed to establish that the patents actually reverted back to Mr. Maier. Moreover, Defendant has effectively conceded to the enforceability of the Agreement by instituting an arbitration demand against Plaintiff for breach of contract as said demand requires an enforceable contract as an element.

This Court next evaluates whether or not the restrictions imposed by the covenant are reasonable. Whether a covenant not to compete is reasonable is a question of law for the court. Henshaw v. Kroenecke, 656 S.W.2d 416, 418 (Tex. 1983). Defendant bears the burden to prove that the restraints are unreasonable. Tex. Bus. & Com. Code § 15.51(b). Under Texas law, a covenant not to compete is unreasonable and should not be enforced if "it imposes upon the [person restrained] any greater restraint than is reasonably necessary to protect the business and good will of the [party in whose favor the covenant runs]." Weatherford Oil Tool Company v. Campbell, 161 Tex. 310, 340 S.W.2d 950, 951 (1960). The covenant not to compete at issue here

imposes a two-year restriction. Plaintiff argues that such a time limit is necessary to ensure that a replacement franchisee can be trained and can establish itself within the Territory without being undermined by the presence of former franchisees. This Court agrees. The two-year time limit is not unduly burdensome nor unreasonable given the character of Plaintiff's business. Texas courts have previously upheld two-year restraints on trade. See Meineke Discount Muffler v. Jaynes, 999 F.2d 120, 123 (5th Cir. Tex. 1993) (citing to Property Tax Assocs., Inc. v. Staffeldt, 800 S.W.2d 349, 352 (Tex. Civ. App. El Paso 1990, writ denied) as finding a two year, county-wide restraint reasonable).

The covenant at issue bars Defendant from competing in ten (10) specified counties and in any other county in which MarbleLife has a franchise or a company office. (Pl.'s Br. In Supp. Of Mot. Prelim. Inj. 5) Plaintiff maintains that the geographic scope of the covenant is reasonable since Plaintiff operates franchises throughout the United States. Defendant argues that the geographic scope of the covenant is unduly broad, however, given the character of Plaintiff's business this Court disagrees. This Court finds that on the basis of the record developed, that Plaintiff is entitled to a preliminary injunction prohibiting Defendant from competing with Plaintiff in the above-mentioned areas. Texas Courts have previously upheld similar restraints where the nature of the movant's business so required. See Vais Arms, Inc. v. Vais, 383 F.3d 287, 296 (5th Cir. Tex. 2004) (concluding that "extending the coverage of the covenant to the fifty states of the Union is reasonable"); Curtis v. Ziff Energy Group, Ltd., 12 S.W.3d 114, 118-19 (Tex. App.--Houston [14th Dist.] 1999, no pet.) (upholding restrictive covenant preventing Vice President of a company from working for any similar company in North America for a period of six month) and Williams v. Powell Elec. Mfg. Co., 508 S.W.2d

665, 668 (Tex. Civ. App.--Houston [14th Dist.] 1974, no writ) (finding a nationwide injunction permissible where business sold was national in character). Accordingly, this Court finds that Plaintiff will likely succeed in establishing a breach of the covenant not to compete.

    ii.    <u>Lanham Act Claims</u>

Secondly, Plaintiff argues that it is likely to succeed on the merits of its Lanham Act, 15 U.S.C. § 114 claim. Section 32 of the Lanham Act provides a cause of action for

> infringement when, without the registrant's consent, one uses in commerce, any reproduction, counterfeit, copy[,] or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or to cause mistake or to deceive. . . ."
> 15 U.S.C. § 1114(1)(a).

"To recover on a claim of trademark infringement, a plaintiff must first show [(1)] that the mark is legally protectable and must then establish infringement by[(2)] showing a likelihood of confusion." <u>Am. Rice, Inc. v. Producers Rice Mill, Inc</u>., 518 F.3d 321, 329 (5th Cir. Tex. 2008); see also <u>S & R Corp</u>., 968 F.2d at 375

In the case at bar, Plaintiff contends that it can satisfy both prongs. Specifically, Plaintiff alleges that it is the owner of United States Trademark Registration No. 1589342 thus, satisfying element one. Texas courts evaluate the likelihood of confusion by evaluating a variety of factors including the type of trademark at issue; similarity of design; similarity of product; identity of retail outlets and purchasers; identity of advertising media utilized; defendant's intent; and actual confusion. <u>Roto-Rooter Corporation v. O'Neal</u>, 513 F.2d 44, 45 (5th Cir. 1975). Here, Defendants use of the MarbleLife ® mark creates the likelihood of confusion as both parties

13

offer the same services. Defendant operates a restoration business nearly identical to the one it operated for 10 years as a MarbleLife franchise and services the same territory. See Am. Century Proprietary Holdings v. Am. Century Cas. Co., 295 Fed. Appx. 630, 636 (5th Cir. Tex. 2008) (noting the "'[t]he greater the similarity between the products and services, the greater the likelihood of confusion,' actual similarity is not required") (citations omitted)

The likelihood of confusion is further evidenced by the fact that Defendant continues to hold itself out as a MarbleLife franchisee, not only using the MarbleLife name but also retaining the company's phone numbers, email addresses, and advertising arrangements thus adding to the likelihood for confusion. See First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc., 923 F. Supp. 693, 703-04 (E.D. Pa. 1996) ("[l]ikelihood of confusion exists when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.") (citing Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir. 1994)). This Court finds that Plaintiff has demonstrated a likelihood of success on the merits with respect to the remaining elements of a Lanham Act violation and, consequently, this factor of the preliminary injunction analysis favors granting the requested relief.

      iii.    Dilution Act Claims

Third, Plaintiff avers that it is likely to prevail on its Federal Trademark Dilution Act, 15 U.S.C. 1125(c) ("FTDA") claims against Defendant. "Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product." Scott Fetzer Co. v. House of Vacuums, Inc., 381 F.3d 477, 489 (5th Cir. Tex. 2004) To prevent this,

14

the FTDA bars "use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). Here, Plaintiff argues that it can establish Defendant's violation of the FTDA as the MarbleLife® trademark has been extensively used throughout the United States in connection with MarbleLife's franchise business. Further, Plaintiff avers that Defendant's use of the mark dilutes the mark as it lessens the ability of customers to identify and distinguish the source of origin of products or services legitimately provided by MarbleLife and its authorized franchisees. To establish trademark dilution, a Plaintiff must demonstrate actual dilution not merely the likelihood of dilution. See Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 433 (2003). However, "[t]he requirement that a plaintiff show actual dilution 'does not mean that the consequences of dilution, such as an actual loss of sales or profits, must also be proved.'" Scott Fetzer Co., 381 F.3d at 490 (citations omitted). In determining whether a mark possesses the requisite degree of recognition FTDA provides that a court may consider factors such as:

    (i) The degree of similarity between the mark or trade name and the famous mark.
    (ii) The degree of inherent or acquired distinctiveness of the famous mark.
    (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
    (iv) The degree of recognition of the famous mark.
    (v) Whether the user of the mark or trade name intended to create an association with the famous mark.
    (vi) Any actual association between the mark or trade name and the famous mark.
15 U.S.C. § 1125.

This Court finds that Plaintiff's mark is famous and distinctive within the meaning of the FTDA

as it has been used for nearly twenty (20) years. In addition, the mark has been used throughout the United States and has been used extensively in Plaintiff's unique advertising arrangements. Defendant's continued use of the name "MarbleLife of Delaware Valley," coupled with Defendant's use of Plaintiff's unique advertising arrangements and phone numbers in the very territory in which it operated as a MarbleLife franchise clearly serves to weaken the recognition of Plaintiff's mark. Accordingly, this Court finds that Plaintiff has demonstrated a likelihood of success on the merits with respect to establishing all elements of a violation of the FTDA and, consequently, this factor of the preliminary injunction analysis favors granting the requested relief.

**B.     Irreparable Harm**

The second factor in the preliminary injunction analysis is that of irreparable harm, which requires an imminent injury such that legal or equitable relief at the end of trial will not remedy the harm. Acierno, 40 F.3d at 653. Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 195(3d Cir. 1990) (quoting Morton v. Beyer, 822 F.2d 364, 372 (3d Cir. 1987)) Morever, the injury must be a presently existing threat, and not a remote or speculative possibility of future harm. Acierno, 40 F.3d at Id. at 655.

Plaintiff strenuously argued, and presented several witnesses who testified, that MarbleLife will suffer irreparable harm in the absence of a preliminary injunction enjoining Defendant from continuing to violate its post-termination contractual obligations. Plaintiff highlighted that Defendant continues to utilize phone numbers that it used when Stone Resources

was a MarbleLife franchise and which Defendant was obligated to transfer upon the expiration of the franchise agreement. (Pl.'s Br. In Supp. Of Mot. Prelim. Inj. 16) District courts within this circuit have reasoned that where a former franchisee continues to use telephone numbers it used as franchisee and agreed to relinquish or transfer upon termination, the franchisee is not only in breach of the franchise contract but also poses a serious threat of irreparable injury. See Cottman Transmission Sys., Inc v. Melody, 851 F. Supp. 660, 669 (E.D. Pa. 1994). Defendant's continued use of MarbleLife's phone numbers in contravention of the Agreement has the likelihood of resulting in damage to MarbleLife's name, reputation as customers will undoubtedly confuse the two entities. This is particularly so where Defendant operates out of the same location and uses similar advertising as it did when it was a MarbleLife franchise. The Third Circuit has held that once the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury. Opticians, 920 F.2d at 196-97 (citations omitted).

Additionally, this Court agrees that Plaintiff has and will continue to be irreparably harmed by Defendant's usurpation of MarbleLife's good will. It is undisputable that Defendant's current actions of operating a stone care and restoration business nearly identical to the one it operated for ten (10) years as a MarbleLife franchise, servicing the same territory, using the customer list from the franchise, and using nearly identical advertisements, reaps the good will that MarbleLife has established. In addition to the above-mentioned, Plaintiff maintains that it has additional interests which require protection. Among these interests are MarbleLife's advertising and marketing strategies and MarbleLife's unique business systems, which were taught to Defendant during its time as franchisee. (Pl.'s Br. In Supp. Of Mot. Prelim. Inj. 22).

Given the likelihood of confusion by consumers caused by Stone Resources Inc., MarbleLife has suffered and continues to suffer irreparable harm. It is irrelevant that there is no evidence that Defendant's business is inferior to that of Plaintiff because, MarbleLife has suffered a loss of control over the reputation of its product, and, consequently, there is a potential that its reputation will be damaged. We find, therefore, that this factors weighs in favor of granting the requested relief.

C.      **Balance of Harms**

In deciding whether injunctive relief is appropriate, we must balance the hardships to the respective parties. Opticians, 920 F.2d at 197. The balancing test is intended to ensure that the issuance of an injunction would not harm the trade dress infringer more than a denial would harm the party seeking an injunction. Id. (citation omitted). Plaintiff argues that Defendant will not be irreparably harmed by a preliminary injunction as the injunction will only compel Defendant to comply with its rightful contractual obligations. In support of this argument, Plaintiff cites to this Circuit's decision in Pappan Enter, v. Hardee's FoodSys., Inc., 143 F.3d 800 (3d Cir. 1998) In Pappan the Third Circuit noted that "a party's self-inflicted harm by choosing to stop its own performance under contract and thus effectively terminating the agreement is outweighed by the immeasurable damage done to the franchiser of the mark.." Id. at 806. This Court sees no reason to deviate from the reasoning in Pappan. The harm which Defendant alleges that it will suffer as a result of a preliminary injunction is at least partially self-inflicted. By failing to renew the Agreement and subsequently failing to adhere to the post-termination obligations under the Agreement Defendant "brought [the] difficulties occasioned by the issuance of an injunction upon [themselves]." Opticians, 920 F.2d at 197 (citations omitted). Accordingly, this Court finds

that the balance of hardships plainly favors MarbleLife and the issuance of the preliminary injunction.

**D.      Public Interest**

The final prong in the preliminary injunction analysis is a consideration of the public interest. Id.  The Third Circuit has held that "[i]n a trademark case, the public interest is 'most often a synonym for the right of the public not to be deceived or confused.'" S & R Corp., 968 F.2d at 379 (quoting Opticians, 920 F.2d at 197).  As this is in essence a breach of contract dispute, the public interest favors enforcing valid contracts and making parties live up to their agreements.  See Siemens Building Technologies, Inc. v. Camacho, No. 01-1613, 2001 WL 395294, *2 (E.D. Pa. Apr. 18, 2001) (noting that it is in the public interest to enforce valid contracts and protect legitimate business interests). We find that the public interest favors granting Plaintiff's request for a preliminary injunction given that Defendant's business is likely to confuse consumers.

**IV.                           CONCLUSION**

Having considered each of the four factors and finding that each weighs in favor of granting the requested injunctive relief, we find that injunctive relief is warranted in this case. Accordingly, this Court grants Plaintiff's Motion for a Preliminary Injunction.

                   **BY THE COURT:**
                   **/s/ Petrese B. Tucker**
                   _____

                   **Hon. Petrese B. Tucker, U.S.D.J.**