IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MARBLELIFE, INC.,                  :
                                   :
                                   :
    Plaintiff,                     :
                                   :          CIVIL ACTION
        v.                         :
                                   :          NO. 10-2480
                                   :
STONE RESOURCES, INC.,             :
                                   :
                                   :
    Defendant.                     :

Tucker, J.                                              May ____, 2012

## MEMORANDUM OPINION

Presently before the Court are Plaintiff's Renewed Motion for Contempt (Doc. 67), and the Response in Opposition thereto (Doc. 68). For the reasons set forth herein, and upon consideration of the evidence presented at the contempt hearing before this Court on March 15-16, 2012 and April 9-11, 2012, Plaintiff's Motion will be granted.

## I.      PROCEDURAL HISTORY

The current motion stems from a contract dispute between Plaintiff, MarbleLife, Inc. ("MarbleLife") a franchisor, and, Defendant, Stone Resources, Inc. d/b/a Natural Stone Care ("Stone Resources" or "Natural Stone Care"), MarbleLife's former franchisee. This matter has been pending before this Court since Plaintiff filed a Complaint for Preliminary Injunction on May 21, 2010 ("the Injunction Action"). The Court granted Plaintiff's Motion on December 23, 2010 after a three-day evidentiary hearing. (Doc. 38, Civ. Act. No. 10-2480). Defendant filed a Motion for Reconsideration on January 3, 2011, which the Court denied on February 11, 2011.

1

(Doc. 56, Civ. Act. No. 10-2480). The February 11, 2011 Order also denied Plaintiff's First

Motion for Civil Contempt and amended the December 23, 2010 Injunction Order. After

Defendant filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, Judge

Madeline D. Coleman of the Bankruptcy Court stayed this Court's Injunction Order. Plaintiff

filed a Motion to Dismiss the bankruptcy action or, alternatively, for relief from the automatic

stay. Judge Coleman denied Plaintiff's Motion. Plaintiff then brought a Second Motion for

Contempt as to Joseph Smith ("Smith"), the principal of Stone Resources, arguing that as a non-

party to the action, Smith was not protected by the automatic stay. This Court denied Plaintiff's

Motion on April 25, 2011. (Doc. 63, Civ. Act. No. 10-2480). However, on June 24, 2011, after

an appeal by Plaintiff ("the Bankruptcy Appeal"), the Court determined that the Bankruptcy

Court's denial of Plaintiff's Motion to terminate the automatic stay was in error, and ordered

Defendant to comply with the Injunction Order. (Doc. 11, Civ. Act. No. 11-2526).  The Court

also amended the Injunction Order on June 24, 2011.[1] Upon Plaintiff's request, the Court held a

hearing on July 8, 2011 in order to facilitate Defendant's compliance with the Court's Order.

However, Plaintiff filed a Motion for Contempt on July 26, 2011 in the Bankruptcy Appeal.

(Doc. 11, Civ. Act. No. 11-7689). Then, Plaintiff filed a renewed Motion for Contempt on

August 11, 2011 in the Injunction Action. (Doc. 67, Civ. Act. No. 10-2480). Both of these

contempt motions are based upon the same allegations of Defendant and Smith's continued

_____

[1]The February 11, 2011 and June 24, 2011 amendments to the December 23, 2010 Order did not alter the substance of the terms of the injunction, but instead changed the time provisions set forth in the Order. Thus, the June 24, 2011 Order is identical in substance to the previous Orders, and is the Order that the Court considers to be at issue for the purposes of Plaintiff's Motion.

noncompliance.[2] The Court held a hearing on the renewed Motion for Contempt on March 15-16, 2012, and on April 9-11, 2012.

## II.   FACTUAL BACKGROUND

This action concerns allegations of breach of contract, trademark infringement, false designation of origin, and trademark dilution. The underlying dispute between the parties concerns the termination of a Franchise Agreement entered into by the parties on April 3, 2000. Plaintiff, a Texas corporation with its principal place of business in Sanford, Florida, is engaged in the business of restoring and repairing granite and other types of inorganic and organic surfaces. Plaintiff sells franchises of its business system by granting to franchisees across the United States the right to use its methods, trademarks, and related services and products. Stone Resources became a franchisee of MarbleLife in April 2000, and began doing business as MarbleLife of Delaware Valley, with its principal place of business in Media, Pennsylvania.  Joe Smith ("Smith") was (and is) the principal and sole shareholder of Stone Resources, and his sister, Patricia (Pattie) Cooney ("Cooney") was the Vice President of Sales. The Franchise Agreement entered into by the parties granted Defendant certain rights including, inter alia, the right and license to operate a franchise in a specified territory.  Additionally, Defendant was granted the right and license to use MarbleLife's registered trademark. In exchange for the rights granted to Stone Resources under the Franchise Agreement, Stone Resources agreed to pay

---

[2]Because the Motion for Contempt filed under the Bankruptcy Appeal is based upon the same allegations of contempt as the Motion in the Injunction Action, the Court finds them to be duplicative, and, by separate Order, will strike the Motion appearing on the Bankruptcy Appeal.

Plaintiff royalties from its gross income, franchise fees and advertising assessments which accrued during the term of the Franchise Agreement.

The Franchise Agreement had an initial term of ten (10) years, which was not extended, and imposed certain requirements upon Defendant following its expiration, including the following: (1) an agreement not to compete during the term of the Franchise Agreement and for a period of two years following expiration of the Franchise Agreement; (2) a requirement to cease using the trademark and/or any System Rights; and (3) a limitation on the use of Plaintiff's confidential information only for the purposes of fulfilling Franchisee's obligations under this Agreement.

In the event of termination, the Franchise Agreement also included additional consequences of expiration, including the following: (1) the immediate termination of all rights granted to Defendant; (2) the transfer of business, customers, facilities, services, employees, and telephone numbers to Plaintiff; and (3) the return or disposal of certain specified information (i.e., all advertising and promotional materials containing the MarbleLife trademark; all information relating to MarbleLife; all manuals and supplements; and all sales or marketing data relating to MarbleLife).  In entering into the Franchise Agreement, Stone Resources further agreed that any violation of the non-compete provision and the confidentiality provisions would cause MarbleLife to suffer irreparable harm and thus MarbleLife could seek damages or injunctive relief against Stone Resources in a court of competent jurisdiction to address said harm.

4

On or around April 13, 2010, the Franchise Agreement between the parties expired. Defendant declined to renew its franchise and as a result, Plaintiff ceased receiving royalty payments, franchise fees and advertising assessments.  Shortly thereafter, pursuant to the terms of the Franchise Agreement, Defendant commenced an arbitration proceeding in Dallas Texas alleging, inter alia, breach of contract and fraud.  The gravamen of Defendant's arbitration complaint concerned Plaintiff's ownership interest in certain patents.  Specifically, Stone Resources avers that it entered into the Franchise Agreement based on representations by MarbleLife that it owned certain patents and trademarks and that MarbleLife possessed unique business formats which could be used in the operation of a MarbleLife franchise.  At the time the Arbitration Demand was made Defendant continued to operate its franchise despite the expiration of the Franchise Agreement and the covenant not to compete.  Consequently, Plaintiff initiated this action seeking injunctive relief and enforcement of the covenant not to compete. This Court granted injunctive relief, and the current motion arises out of allegations that Defendant and Smith have been non-compliant with the Injunction Order. Plaintiff's averment of non-compliance stems from allegations that Stone Resources and Smith have continued to advertise Stone Resources as a stone restoration business; have continued operating via a business relationship with another company, Moore Jones; and have failed to relinquish phone numbers and email addresses associated with the business, all in violation of the Court's Injunction Order.

III.     **LEGAL STANDARD**

To prove civil contempt, the moving party must demonstrate by clear and convincing evidence that "(1) a valid court order existed, (2) the defendant had knowledge of the order, and

(3) the defendant disobeyed the order. <u>Harris v. City of Phila</u>, 47 F.3d 1311, 1326(3d Cir. 1995)

(citing <u>Roe v. Operation Rescue</u>, 919 F.2d 857, 871 (3d Cir. 1990)). "A contempt citation should

not be granted if there is ground to doubt the wrongfulness of' the defendant's conduct." <u>Id.</u>

(quoting <u>Quinter</u>, 676 F.2d at 974). A defendant "may not be held in contempt as long as it took

all reasonable steps to comply." <u>Id.</u> at 1324. "However, the burden is that of the defendant to

introduce evidence beyond 'a mere assertion of inability,' and to show that it has made 'in good

faith all reasonable efforts to comply.'" <u>Id.</u> (quoting <u>Citronelle-Mobile Gathering, Inc. v.</u>

<u>Watkins</u>, 943 F.2d 1297, 1301 (11th Cir. 1991)).

## IV.   <u>DISCUSSION</u>

The provisions in the Preliminary Injunction Order which Plaintiff alleges Defendant and

Smith have not complied with are as follows:

> (b) Within seven (7) business days from the date of entry of this Order, Stone Resources shall provide to MarbleLife a list of Stone Resources' existing customers since May 2000, as well as all invoices on file for such customers;

> (c) Stone Resources shall immediately take all reasonable steps necessary to relinquish and transfer to MarbleLife's control the phone number (610) 565-5666, and all other phone numbers, cell phone numbers, fax numbers, email addresses, Web site domains and fictitious names (or "doing business as" names) used by Stone Resources;

> (d) Within seven (7) business days from the date of entry of this Order, Stone Resources shall provide to MarbleLife a list of all other landline, cellular, VoIP, facsimile, and/or telecopy numbers, and email addresses that have been used in association with Stone Resources' business as a MarbleLife franchisee or in connection with offering surface restoration and cleaning products and services in competition with MarbleLife after the expiration of the Franchise Agreement; and Stone Resources shall thereafter reasonably and in good faith and at the election of MarbleLife either (i) assist MarbleLife in forwarding and/or patching such additional numbers to or through a MarbleLife-controlled number, or (ii) by way of consent and/or execution of any necessary documents, assist MarbleLife in assuming for its use such additional numbers;

6

(f) Stone Resources shall immediately take all reasonable steps necessary to relinquish and transfer to MarbleLife's control its advertising rights in all Distinctive Living Publications and all other advertising used by Stone Resources;

(g) For 15 months from the date of entry of this Order, Stone Resources shall cease and desist from engaging, participating or assisting in any business or offering within Philadelphia County, Delaware County, Chester County, Montgomery County and Bucks County, Pennsylvania; New Castle County, Delaware; Gloucester, Camden, Burlington, or Salem Counties in New Jersey, or any other county throughout the United States in which MarbleLife has a franchise or a company office; (i) any service or product related to the restoration, repair, and care of marble, granite, concrete, and other types of inorganic and organic surfaces, (ii) any service or product related to the treatment, coating, and sealing of such surfaces, and (iii) any service or product related to the restoration, repair and care of grout.

Plaintiff has demonstrated beyond clear and convincing evidence that Stone Resources and Smith have blatantly violated this Court's Order. To begin, the Court has no doubt that Defendant and Smith were aware of the valid Injunction Order issued in this case, particularly given the parties' frequent communications with the Court regarding issues of compliance with that Order. As for the question of whether Defendant and Smith obeyed the Order, during the hearing for contempt, Defendant's counsel repeatedly represented to the Court that "Stone Resources is not operating." Plaintiff, however, presented an abundance of evidence that Defendant's representation was patently false. The Court will take each of these provisions in turn.

1.    <u>**Defendant and Smith are in violation of part (b) of the Injunction Order**</u>

Part (b) of the Injunction Order required Defendant to provide MarbleLife with a list of Stone Resource's existing customers since May 2000, along with all invoices on file for those customers. Defendant claims to have complied with this provision by providing Plaintiff with a stack of invoices dating back to only January 2010, which, according to Smith included "every

existing customer." (3/15/12 Tr. 53: 11-12). Smith claimed that this stack of invoices took "20 man hours to reproduce . . . [because Stone Resources does] not retain hard copies of the materials and each invoice must be retracted." (Pl.'s Ex. 5). However, Alan Mayr ("Mayr"), Chief Operating Officer for Marblelife, testified that it would have taken a mere fifteen minutes for someone to download the contact information for Stone Resource's existing customers since May 2000 from Quickbooks, the computer accounting system which all MarbleLife franchises were required to use. (4/10/12 Tr. 64-66). Moreover, Mayr testified that the invoices provided to MarbleLife were an incomplete set – there were 543 invoices missing. (4/10/12 Tr. 70:2-4). Furthermore, the invoices did not contain sufficient contact information for Stone Resources customers – many only contained the name of the company and a billing address. (Pl.'s Ex. 52; 3/15/12 Tr. 78:6-15).

Smith claims that the invoices which were not provided to MarbleLife were not "existing customers," but "historic customers." (3/15/12 Tr. 71: 12-72:2). Apparently, Smith was under the impression that he merely had to turn over the invoices for customers with which he was "actively doing business" at the time. (3/15/12 Tr. 72: 25-73:1). Yet, despite this belief that only active customers were pertinent to MarbleLife, Smith still found it necessary to send an email blast to hundreds of additional customers of which MarbleLife had no knowledge to inform these customers that

> Natural Stone Care is temporarily unable to continue offering stone and concrete restoration and maintenance services . . . . In the interim, Pattie Cooney has been hired by Moore Jones Building Service Solutions LLC, offering the same services and working in the same capacity. In addition, the technicians from NSC have also been hired by Moore Jones. Moore Jones is fully equipped to maintain your stone or concrete needs with the same level of high quality and professionalism you received from Natural Stone Care. . . I would greatly appreciate the

opportunity to have Pattie work with you for any of your needs through Moore Jones.

(Pl.'s Ex. 92A).  Mayr also testified that upon examining the recipient list of Smith's email blasts, MarbleLife discovered that Smith communicated with 167 customers who were not included in the packet of invoices that Stone Resources provided to MarbleLife. (4/10/12 Tr. 75:22-23). It is clear then that Smith had access to this contact information, but chose to disobey the Court's order and instead supply MarbleLife with an unorganized, uninformative set of invoices. Therefore, the Court finds that Defendant and Smith have not complied with part (b) of the Injunction Order.

## 2. Defendant and Smith are in violation of parts (c), (d), and (f) of the Injunction Order

Next, Part (c) and (d) of the Court's Injunction Order required Defendant to relinquish to MarbleLife all phone numbers, fax numbers, and email addresses used by Stone Resources. However, the very first witness introduced by Plaintiff at the contempt hearing revealed that Stone Resources has done anything but. Joanne Jeuch, Alan Mayr's sister, testified that she contacted Natural Stone Care, a company owned by Smith, in September 2011 using a phone number, (484) 444-0021, which she found in a listing on "thebluebook.com." (Pl.'s Ex. 8; 3/15/12 Tr. 19: 12-20:2; Pl.'s Ex. 92A). Smith admitted that Stone Resources used that phone number as a secondary contact number, and continues to use the number today. (3/15/12 Tr. 31:3-32:1). When she called the phone number, Jeuch left a voicemail on an answering machine for Natural Stone Care communicating that she wished to have restoration work done in her home. (3/15/12 Tr. 20: 17-24). Cooney, Smith's sister and former Vice President of Sales for

9

Stone Resources, returned Jeuch's call. Cooney asked Jeuch to send pictures of her home to an email address at Moore Jones, not at Natural Stone Care – pccooney@moorejonesllc.com. (Pl.'s Ex. 13; 3/15/12 Tr. 21:23-22:6-15). In turn, the work was completed by Moore Jones employee, Chaz McFadden, and not by anyone from Natural Stone Care. (3/15/12 Tr. 25: 9-13).

Smith also placed an advertisement for Natural Stone Care in the 2012 Building Owners and Managers Association ("BOMA") book, and provided the same 484 phone number as a contact number. (Pl.'s Ex 7). The 2012 Eastern Pennsylvania Delaware Bluebook also contained an advertisement for Concrete Resources, LLC, a company owned by Smith's wife, Margaret Smith, with the same telephone number: (484) 444-0221. Moreover, the paper and online Bluebook listings for Natural Stone Care and Concrete Resources, LLC provide the same fax number: (888) 688-5491. (Pl.'s Exs. 9-10). Lastly, Smith admitted at the contempt hearing that he has used his cellular phone number, (610) 517-0653, for business purposes after issuance of the Injunction Order. (3/15/12 Tr. 35:12 – 37:2).

Smith and Cooney have also used email addresses for business purposes which were not reported to Plaintiff. For example, Cooney sent emails from pattiecooney23@gmail.com to inform former Stone Resources clients that "Moore Jones is fully equipped to maintain your account with the same level of quality and professionalism you recieved from Natural Stone Care." (Pl.'s Ex. 72). Smith sent similar emails from the email address, joesmith@naturalstonecare.net and jtsmith5@comcast.net. (3/15/12 Tr. 140:3-11; Pl.'s Exs. 25, 92(A)).  None of these phone numbers or emails were reported or relinquished to Plaintiff in accordance with this Court's Injunction Order. Moreover, it should go without saying that the advertisements in publications for the 2012 year are in direct contravention of provision (f) of the

Court's Injunction Order requiring Stone Resources to relinquish all of its advertising to MarbleLife.

### 3.     Defendant and Smith are in violation of part (g) of the Injunction Order

The most disturbing facts providing the basis for Plaintiff's Motion for Contempt relate to provision (g) of the Court's Injunction Order, which required Stone Resources to "cease and desist from engaging, participating or assisting in any business or offering . . . any service or product related to the restoration, repair, and care of marble, granite, concrete, and other types of inorganic and organic surfaces, (ii) any service or product related to the treatment, coating, and sealing of such surfaces, and (iii) any service or product related to the restoration, repair and care of grout." Once again, Defendant, via Smith and his counsel, repeatedly assured the Court that Stone Resources was not operating. However, Plaintiff presented an abundance of evidence to the contrary. First, Smith admitted that Stone Resources employees completed a job for a company called Belfor during the week of July 11, 2011. (4/11/12 Tr. 16: 24-25). Ironically, Smith also admits that he completed the Belfor job after appearing before this Court on July 8, 2011 in a proceeding to address Plaintiff's allegations that Defendant was noncompliant with the Injunction Order.  (4/11/12 Tr. 42: 11-15) Rather than asking for the Court's permission to complete the Belfor job, Smith merely told the Court that he "was very conflicted on that and I made the decision to do it and if I went against the Order, I am very sorry." (4/11/12 Tr. 42: 11-15).

The most telling testimony regarding provision (g), however, came from Smith's sister, Pattie Cooney, and Cecil Moore ("Moore"), partial owner of Moore Jones, a janitorial business,

which, after discussions with Smith, expanded into the stone restoration business. Setting the background for this testimony is an email between Smith and a representative from BOMA on August 18, 2011 in which Smith writes, "[w]e have been working on our plan B for my company to comply with the position we are in with the federal court while awaiting our appeal to the third circuit federal court. All accounts will be serviced by another entity until resolution of the legal dispute." (Pl.'s Ex. 68). The discussions regarding the formation of this "other entity" began on August 10, 2011 when Cooney, Smith, John Jones ("Jones") of Moore Jones, and attorney for Smith and Stone Resources, Paul Winterhalter ("Winterhalter"), met at Winterhalter's office to discuss the possibility of Moore Jones starting a stone and tile division which would utilize Stone Resource's employees and equipment and for which Cooney would solicit  past clients of Natural Stone Care. (4/9/12 Tr. 124-126).

Moore, Smith, Jones, and John Allen ("Allen") met at CHAMPS restaurant in the second week of August for the purpose of introducing Moore to the possibility of creating a "working relationship" in which Moore Jones could "expand [its] offering." (4/10/12 Tr. 3-4). Those involved at the meeting specifically discussed the possibility that Cooney would pursue past clients of Stone Resources to generate business for Moore Jones. (4/10/12 Tr. 19: 14-22). Cooney would also facilitate the transfer of Stone Resources employees to Moore Jones. (4/10/12 Tr. 15:17-16:8). As a result of that meeting, on August 14, 2011, Cooney emailed Moore a proposal, in which she described the venture as a "turn-key operation" which would be managed by Cooney, and within which profits would be split equally between Moore Jones and Stone Resources. (Pl.'s Ex. 63). Cooney noted that it was "very important to my existing client base that we resume operations asap." (Pl.'s Ex. 63). Under a "Things To Do" label in the proposal

12

the following items were listed:

> PAC will contact all clients this week and make recommendation to utilize
> services of MJ for their stone restoration maintenance contracts as well as future
> contracts.
> Offer letters must be sent to all employees with compensation package from MJ.

(Pl.'s Ex. 63). The proposal also involved a lease agreement in which Stone Resources

would lease various stone restoration equipment and vehicles to Moore Jones for $25,000

per month. (Pl.'s Exs. 23, 63). Lastly, the proposal included the names and addresses of

Stone Resources employees. (Pl.'s Ex. 63).

On August 16, 2011, Moore responded to Cooney's email indicating that he was prepared

to move forward with the "potential partnership" based on various conditions. (Pl.'s Ex. 65).

These included a monthly lease payment by Moore Jones of $20,500; a 50/50 profit split;

isolation of the records for the Moore Jones stone restoration business from all other Moore

Jones business; and a lease term beginning October 2011 which would provide a six-week grace

period. (Pl.'s Ex. 65).

Throughout all of these exchanges, the parties indicated that they were concerned about

creating a paper trail which included Smith. Therefore, Smith was not copied on any emails, and

Cooney deleted any emails between Smith and her regarding the venture with Moore Jones.

(4/9/12 Tr. 135:7-19). Meanwhile, Cooney had to get Smith's approval for the core terms of the

agreement – for example, Smith reviewed the business proposal before Cooney sent it to Moore

Jones. (4/9/12 Tr. 136:1-5).

On August 29, 2011, the group met again. This time, Moore was presented with the

proposed partnership and lease agreements, which Smith urged him to sign. However, Moore delayed signing either agreement because he wanted to continue to test the venture's success. (4/10/12 Tr. 34-37). The lease agreement was finally executed as of October 1, 2011, however, upon advice of counsel, Moore never signed the partnership agreement. (Def.'s Ex. 1, 4/10/12 Tr. 39:1-15).[3] The lease agreement was, in turn, approved by the Bankruptcy Court in a hearing on December 13, 2011. (Pl.'s Ex. 93 at152-53). According to Moore, despite the October 2011 execution of the lease agreement, given the grace period, the parties to the agreement acted under the assumption that there was a partnership agreement between Stone Resources and Moore Jones throughout the months of August and September. (4/10/12 Tr. 3-9); see also, Pl's Ex. 83 (describing a conversation between, Eugene Orlando ("Orlando"), counsel for Moore Jones, and Winterhalter, in which Winterhalter informed Orlando that "he thought [Moore Jones and Stone Resources] were already operating under a verbal lease arrangement perhaps even several weeks before [Orlando] was first contacted to review the first draft of this agreement"). In fact, the offer letters from Moore Jones to Stone Resources employees indicated that the employment offers were effective between August 14, 2011 and August 22, 2011. (Pl.'s Ex. 69).

Beginning in August, Cooney reached out to Stone Resources customers to recommend Moore Jones' services. (4/9/12 Tr. 140: 7-25). Plaintiff produced numerous documents indicating that Cooney directly solicited former Stone Resources customers for Moore Jones. For example, in a September 26, 2011 email, Cooney informed a former Stone Resources customer that Moore

---

[3] Counsel for Moore Jones, Eugene Orlando, advised Moore in an email that "if your activities also involve any business dealings of any kind with any of the debtor's offices or owners, you have exposure to that collateral litigation and I have not been given any information to independently evaluate that risk." (Pl.'s Ex. 83).

Jones could "do her bathroom" because Stone Resources "had another name change in August . .

. . In the meantime, Moore Jones, another company in the industry, has hired me and all of my

employees into their stone division so that we can continue to service our clients. So, nothing has

changed other than the name on the invoice." (Pl.'s Ex. 74).

Although Moore Jones wished to avoid a paper trail which included Smith, Smith

assisted Cooney in running the Moore Jones stone restoration division by actively referring

customers to Moore Jones, as well as preparing bids and providing estimates for Moore Jones'

customers. (4/9/12 Tr. 167:8-168:8). In fact, on at least seven occasions between August 2011

and March 2012, without Cooney asking him, Smith prepared bids for customers (or in his

words, "gave [his] opinion" regarding what his sister should charge for the job) and then either

provided the information to Moore Jones, or encouraged the potential customer to contact Moore

Jones. (4/9/12 Tr. 78:19-83:16; 88:1-2; 170: 21-171:13; Pl.'s Ex. 85). Some of these bids were

completed while Stone Resources was still permitted to operate, and merely transferred to Moore

Jones to complete. (4/9/12 Tr. 174:2-10). Plaintiff also presented various emails which revealed

that customers would contact Cooney at Moore Jones, who would then pass their information

along to Smith so that he could "provide his opinion" regarding the work request. (See, e.g.,

Pl.'s Ex. 89 at PC02353). In other emails, customers contacted Smith directly at Natural Stone

Care, and Smith replied whether "we," or Moore Jones, would be interested in the work. (Pl.'s

Ex. 89 at SRC 01172, 01173).

Given these facts, it is more than apparent to the Court that Defendant and Smith,

violated the provision of this Court's Order which prohibited Stone Resources from competing

with MarbleLife in the stone restoration business. Although Defendant's counsel represented that

15

Stone Resources was no longer operating, Plaintiff has clearly demonstrated that Stone

Resources was in fact operating under the guise of a lease agreement with Moore Jones.

Defendant argues that Moore Jones and Stone Resources never acted as a partnership, and

therefore did not violate the Court's Order. However, even if the Court accepted this argument,

the emails and other solicitations encouraging Stone Resources customers to employ Moore

Jones' services, the provision of Stone Resources employees to Moore Jones, and Smith's site

visits and preparation of estimates for Moore Jones, all clearly qualify as assistance to a

MarbleLife competitor in contravention of section (g) of the Injunction Order.

    **4.**    **Defendant has not carried its burden of demonstrating that it made**

          **reasonable efforts to comply with the Injunction Order**

       Plaintiff has met its burden of demonstrating contempt by clear and convincing evidence.

Defendant, on the other hand, has not met its burden of demonstrating that it made a good faith

effort to comply with the Court's Order. Smith's testimony was largely incredible, particularly

given that he had substantial difficulty giving direct answers to the vast majority of questions

posed to him by Plaintiff's counsel. Stone Resources, its counsel, and Smith have chosen to

quibble over the interpretation of this Court's Order, and as a result have blatantly disregarded

this Court's authority. For example, Smith claims that he did not "know that a Court Order had

ever told [him] to not speak to anybody or give an opinion." (4/9/12 Tr. 88: 10-12). Yet the Court

finds it extremely hard to believe that Smith, a business owner, did not know that giving

opinions, performing estimates, and conducting site visits on behalf of Moore Jones qualified as

assistance in violation of the Injunction Order. Similarly, Smith testified that the Court's Order

requiring Defendant to provide Plaintiff with contact information for "existing" clients meant

that he only had to turn over customers with whom he was "actively doing business" at the time. (4/9/12 Tr. 72: 24). Yet at the same time that Smith concluded that historic customers were not important to Plaintiff, Smith turned around and contacted all of these customers to inform them about Moore Jones' new services. In fact, despite a plethora of evidence to the contrary, Smith, under oath, denied having any discussions regarding transferring Natural Stone Care business to Moore Jones, testifying that it "[n]ever came up." (3/15/12 Tr. 152:16-24).

Defendant's counsel also failed to ensure the Court that Defendant acted in good faith. For example, in an August 2011 email responding to Cooney regarding a question about the proper source of the start-up funds for the Moore Jones venture, Winterhalter responded: "Joe did mention the start up cost challenge. That money cannot come from SR. Could come from Joe to you to MJ. We can work that out." (Pl.'s Ex. 64). The Court also takes issue with Defense counsel's assurances not only to this Court, but to the Bankruptcy Court, that the lease agreement was not an attempt at an "end-run" around the Court's Injunction Order. (See Pl.'s Ex. 93 at 152). In light of the evidence, such assurances were meritless misrepresentations. Correspondingly, the Court is not convinced that Defendant or Smith made reasonable efforts to comply with the Court's Order.

## V.   <u>CONCLUSION</u>

In light of the foregoing, the Court will grant Plaintiff's renewed Motion for Contempt and find both Stone Resources and Smith in contempt. An appropriate Order follows.

17